STATE OF VERMONT

SUPERIOR COURT

ENVIRONMENTAL DIVISION
Docket No. 164-12-17 Vtec

| | |
|---|---|
| DeVita Subdivision Amendment | DECISION ON THE MERITS |

The present appeal is of a November 14, 2017 decision of the Town of Williston (Town) Development Review Board (DRB) denying Frank and Christel DeVitas' application for a discretionary subdivision permit. The DeVitas appeal the decision to this Court. The DeVitas' Statement of Questions originally contained four Questions. In an October 1, 2018 decision on the parties' cross-motions for summary judgment we answered Questions 1, 2, and 3. Thus, our trial focused on Question 4 as amended pursuant to our October 1, 2018 decision.

This Court presided over a single-day trial on February 13, 2019, at the Costello Courthouse in Burlington, Vermont. We conducted a site visit on the morning of February 12, 2019. The DeVitas are represented by Christopher Roy, Esq. The Town is represented by Paul Gilles, Esq.

Based upon the evidence produced at trial, which was placed into context through the site visit, the Court renders the following Findings of Fact and Conclusions of Law.

**Findings of Fact**

1.     The DeVitas own property located on Fieldstone Drive (the Property) in Williston, Vermont. The Property is 35.44 acres.

2.     The Property was originally created by subdivision on December 19, 1995 (the Original Permit). The Original Permit created four building lots (Lots 1 through 4); the Property (Lot 5), which presently contains a large meadow and single house site; a wastewater disposal lot; and a right-of-way for a public roadway.

3.     Lots 1 through 4 range in size from 1.26 to 1.53 acres. The wastewater disposal lot is 1.2 acres.

4.     The DeVitas originally proposed a 6-lot subdivision. The factor limiting the number of lots in the Original Permit to five was the amount of suitable soils for primary and secondary

wastewater disposal areas, as required by State regulations at that time. Ten suitable wastewater locations were identified, therefore only five building lots were accommodated.

5. A "no build zone" was marked on the final plat. It contains 26.67 acres of open space and is located to the north of Fieldstone Drive.

6. The Original Permit was not appealed and the DeVitas filed a final subdivision plat in the Town land records (1995 Plat).

7. Following approval in 1995, the DeVitas constructed Fieldstone Drive to Town specifications and built a home on Lot 1, which is located at 290 Fieldstone Drive.

8. Fieldstone Drive serves five house sites, is approximately 2,000 feet in length, and has a hammerhead at the east end where the road terminates.

9. In 2010, the Town's Unified Development Bylaw (Bylaw) was amended to require cul-de-sacs rather than hammerheads at the end of dead-end streets.

10. The Town took ownership and control over Fieldstone Drive in 2015.

11. State wastewater regulations were modified in 2007. Modifications included elimination of the requirement of secondary disposal areas, sometimes referred to as "replacement areas."

12. The reduction in the number of required disposal areas freed up land for additional house sites.

13. The Bylaw now requires that a subdivision over 10.5 acres must provide open space of 75% of the total lot.

**The Present Application**

14. The Bylaw sets forth a multi-stage review process for development requiring a discretionary permit. Bylaw Chapter 6.

15. Pre-application review is the first step in this process. Bylaw § 6.2 sets forth the Town's pre-application review process.

16. On March 18, 2016, the DeVitas submitted a pre-application to further subdivide the Property (the 2016 Pre-Application). Additionally, they sought to merge the wastewater disposal lot with Lot 1. The 2016 Pre-Application proposed to reconfigure Lot 5 to create three building lots (Lots 6—8), with the retention of the originally approved house site on Lot 5, and leave the remaining land as open space (the Project).

2

17.     New Lot 6 is located near the terminus of Fieldstone Drive to the east.

18.     New Lots 7 and 8 are located on the north side of Fieldstone Drive in the southwest corner of Lot 5.

19.     The originally approved house site on Lot 5 remains in the southeast corner of Lot 5 and is now proposed as its own lot.

20.     The remainder of Lot 5, the open space, is to be owned in common by the Fieldstone Drive homeowners.

21.     On April 26, 2016, and May 24, 2016, the DRB held hearings on the 2016 Pre-Application. The minutes of these hearings, as approved on June 17, 2016, authorized the DeVitas to file an application for a discretionary permit to amend the Original Permit as proposed (the 2016 Decision).

22.     The 2016 Decision included various recommendations made by the DRB regarding the application. The list of recommendations included two crossed-out recommendations relating to the Public Works road design standards, which would have recommended a cul-de-sac instead of a hammerhead road design at the pre-application stage.

23.     A June 17, 2016 cover letter sent with the meeting minutes states: "You are advised that decisions of the DRB may be appealed to the Vermont Environmental Court, within 30 days from the date of this letter, as provided by 24 V.S.A. § 4471."

24.     The 2016 Decision was not appealed.

25.     On March 28, 2017, the DRB approved three units of growth management allocation for the three building lots proposed in the 2016 Pre-Application, beginning on July 1, 2017.

26.     The DeVitas then moved to the next stage of the review process by applying for a discretionary permit. On November 14, 2017, the DRB denied the permit (the 2017 Decision). Among the reasons for denial were conflicts with the conditions of the Original Permit and access which did not comply with Public Works design standards. Specifically, the DRB found fault with the proposed lot configuration and the road design, which was a hammerhead instead of a cul-de-sac.

27.     The DeVitas appealed the 2017 Decision to this Court on December 13, 2017.

3

## Conclusions of Law

In our October 1, 2018 decision addressing the parties' cross-motions for summary judgment, we concluded that the 2016 Decision is final and binding as far as it authorized the DeVitas' proposed Project to proceed to later stages of review. The 2016 Decision did not effectively approve the Project or its lot configuration and hammerhead design through the recommendations made therein. The Town was not obligated to approve the discretionary permit. Therefore, we granted in part and denied in part the DeVitas' motion for summary judgment on Questions 1 and 2 and granted in part and denied in part the Town's motion on these Questions. We further concluded that the DeVitas did not sustain their claim of equitable estoppel against the Town and granted the Town's motion on Question 3. That left us with Question 4, which we ordered the DeVitas to clarify.

On October 24, 2019, the DeVitas filed their Amended Statement of Question in response to our October 1, 2018 decision. Amended Question 4, having several sub-parts, states as follows:

4.     Should the DeVitas' application for a discretionary permit be granted consistent with the June 17, 2016 pre-application review determination and the pertinent standards set forth in the Town of Williston's Unified Development Bylaw? More particularly:

a.     Do the building envelopes for proposed new Lots 7 and 8 conform fully with the 1995 subdivision plat because they are located entirely outside the 1995 "no build zone"?

b.     Should the Court approve the proposed new Lot 8 notwithstanding its minor incursion into a portion of an 'accessory building envelope' shown on the 1995 plat because this would not constitute a change to a permit condition that was included to resolve an issue critical to the 1995 subdivision approval?

c.     Is the hammerhead style street end that was constructed and turned over to the Town consistent with the DRB's 1995 approval subject to change to a cul-de-sac occupying substantially more space due to the DeVitas' application asking that one of the lots approved in 1995 be further subdivided?

d.     Can the town now raise, absent a cross-appeal, any claim that the DeVitas' application to subdivide one lot should now be deemed as seeking an amendment of the previous six-lot subdivision approved in 1995?

i.     If the Town can raise this issue, should the requested subdivision of a single lot be deemed a new subdivision, or an amendment of the previous six-lot subdivision approval in 1995?

ii.     If the Town can raise this issue, and the Court deems the DeVitas' application to be one seeking amendment of the previous six-lot subdivision approved in 1995, is an amendment of the 1995 subdivision plat nonetheless permissible under the standard enunciated by the Vermont Supreme Court in *In re Hildebrand,* 2007 VT 5, 181 Vt. 568 (mem.) and *In re Stowe Club Highlands,* 166 Vt. 33 (1996), due to regulatory and technological changes relating to the design of residential wastewater systems?

Because Question 4(d) and its subparts raise a threshold issue, we begin our analysis with the issue of whether the present application is one for an amendment of a prior subdivision.[1] We then address the remaining issues in turn.

## I.     Whether the present application is one for an amendment or an original application

The DeVitas assert that the present application is not one for an amendment of the Original Permit but instead is a proposal for an entirely new subdivision. This is because the present application does not alter any of the previously permitted lots other than Lot 5. Therefore, they assert we should consider the present application separate and apart from the Original Permit and any conditions contained therein.

The Town asserts that the Original Permit is final and binding. Therefore, as the present application seeks to alter aspects of that permit, the DeVitas must satisfy the Hildebrand standard in order to develop Lot 5.

We can find no case law that has treated an application to develop a discrete aspect of a prior-permitted subdivision as an original application instead of one for amendment. Conversely, we have found multiple instances where both the Vermont Supreme Court and this Court have

---

[1] We note that the DeVitas' Statement of Questions appears to assert that the issue of whether the present application is one for an amendment rather than an original permit is not before the Court. Their post-trial brief, however, states both that "the Court must determine whether the DeVitas' application is properly deemed an application for a new subdivision, . . . or for an amendment of an existing subdivision" and that "[t]he question presented here is what is the dividing line, if any, as to when further subdivision of a single, existing tract of land is deemed either a new subdivision, or an amendment of an existing subdivision." Appellants' Post-Trial Memorandum, p. 4—5. Through these statements, the DeVitas appear to concede that the determination of the applicability of the amendment standard is properly before the Court.

Further, the appropriate legal standard that is applicable on appeal is a legal question to be decided by this Court, not a Statement of Questions. See Gabitelli v. Town of Brookfield, 2011 VT 122, ¶ 5, 191 Vt. 76 (defining the applicable legal standard as a question of law decided by the trial court). Therefore, the applicability of the Hildebrand standards is before the Court without a cross-appeal raising this specific issue. 2007 VT 5, 181 Vt. 568.

Further, to the extent the DeVitas' Question 4 asks whether the discretionary permit must be granted consistent with the 2016 Decision, that question was previously answered in our October 1, 2018 decision.

treated such applications as ones for amendment either in both the Act 250 and municipal permit context. See In re Hildebrand, 2007 VT 5, 181 VT. 568 (treating property owners' application to develop a lot previously designated as open lands in a prior subdivision permit as an application to amend the prior permit) (mem.); In re N. Acres, LLC, 2007 VT 109, 182 Vt. 618 (treating a developer's proposal to subdivide a parcel that had been designated as common land in a previously approved planned residential development as an amendment application); In re Ledgewood Condo PUD CU Amendment Application, No. 150-7-07 Vtec (Vt. Envtl. Ct. Aug. 26, 2008) (Durkin, J.) (applying the Hildebrand standard to an application to amend a pre-existing conditional use permit for an already completed planned unit development to allow for development on land originally designated to satisfy density requirements for the prior development).

These decisions are based on the basic principle of finality in land use litigation. It is the function of a subdivision permit "to approve plats of land" and, for this reason, "recorded plats necessarily become permit conditions." In re Stowe Club Highlands, 164 Vt. 272, 276 (1995). The failure to appeal a permit condition binds successors in interest. See 24 V.S.A. § 4472(d); Hildebrand, 2007 VT 5, ¶ 11.

While it may be true that the DeVitas' proposed subdivision does not intend to affect any other aspect of the Original Permit beyond Lot 5, by virtue of the original subdivision and the 1995 Plat, this application is one for amendment, not an original permit. The DeVitas propose to modify one lot, but that lot remains part of the larger subdivision that was created by the Original Permit. As such, we apply the standards set out by Hildebrand.

In Stowe Club Highlands, the Supreme Court identified that, with respect to permit amendments, "the central question . . . is not whether to give effect to the original permit conditions, but under what circumstances those permit conditions may be modified." 166 Vt. 33, 37 (1996). There are three factors that have been identified as grounds for amendment: (1) whether there had been "changes in factual or regulatory circumstances beyond the control of a permittee"; (2) whether there had been "changes in the construction or operations of the permittee's project, not reasonably foreseeable at the time the permit was issued"; and (3) whether there had been "changes in technology." Id. at 36. These factors are intended to "assist

6

in assessing the competing policies of flexibility and finality in the permitting process" and ensure that the initial permitting process would not be "merely a prologue to continued applications for permit amendments." In re Nehemiah Assocs. II, 168 Vt. 288, 294 (1998). In Hildebrand, we applied Stowe Club Highlands in the municipal zoning context. 2007 VT 5, ¶ 13.

At issue in the present matter is whether there has been a change in factual or regulatory circumstances beyond the DeVitas' control. Specifically, whether changes in Vermont's wastewater regulations that resulted in more buildable space on Lot 5 justify amendment of the Original Permit.

In the early stages of the 1995 permitting process, the DeVitas proposed a 6-lot subdivision. During the application process, however, they reduced their proposal to five lots due to the limited availability of suitable soils for wastewater disposal fields. At the time, State wastewater regulations required lots to have both a primary and replacement wastewater disposal field. The DeVitas' could only locate ten satisfactory fields. As such, the Planning Commission noted in its approval that this was the reason for the reduction in lots from six to five.

In 2007, the State amended its wastewater regulations. This revision eliminated the requirement that each lot be served by two disposal fields. Therefore, more lots could be developed in the subdivision than under the prior regime. We conclude this change, particularly in light of its specific impact on the scale of the Original Permit, weighs heavily in favor of flexibility in allowing the DeVitas to seek an amendment of the subdivision permit.

There has also been a relevant change in the Bylaw. Since the Original Permit, the Bylaw has been amended to set an open space requirement. The Town asserts that this reflects the Town's interest in limiting development and therefore weighs in favor of finality.[2] We agree that

---

[2] We are confused by the Town's arguments with respect to these Bylaw changes. In its post-trial memorandum, the Town asserts that this Bylaw change, and an amendment related to septic disposal that is not discussed in detail, is "insufficient to justify authorizing the proposal before the court." This assertion appears to conflate two issues: whether the DeVitas are entitled to seek an amendment and, if so, whether that amendment application complies with the relevant Bylaw. At present, we are not concerned with the merits of the DeVitas' proposal pursuant to the Bylaw, but instead must analyze the threshold issue of whether grounds exist for such an amendment to be sought.

Additionally, the Town asserts that the Commission had no reason to expect that the DeVitas would want to increase the number of lots in the subdivision in the future, such that this amendment was not foreseeable.

this requirement does reflect an interest in limiting development, but also reflects an interest in protecting certain categories of land for conservation and recreational purposes generally. See Bylaws §§ 31.7.2, 31.7.5. For this reason, we conclude that this change weighs slightly in favor of finality because it represents an interest in limiting development.

Finally, we note that in the 1995 approval process, the Planning Commission recognized two "unfortunate" aspects of the then-proposed development. First, that there were a number of off-site wastewater disposal fields. Second, that the public roadway was lengthy and expensive "to serve only 5 lots." Planning Commission Approval, p. 3 (Nov. 7, 1995) (filed as Town Ex. A). It noted, however, that these factors were not grounds to deny the development. Id.

With respect to the present proposal, the number of off-site wastewater fields will not be affected, given the change in State regulations. Further, the public roadway will serve more lots, addressing the Planning Commission's concern regarding the road. While these factors may not be directly relevant to the standards set out in Hildebrand, we find they provide helpful context in analyzing whether the DeVitas may seek an amendment to their approximately 24-year-old subdivision permit in response to changes in the State's wastewater regulations made 12 years ago.

For all these reasons, we conclude that there has been a change in the regulations beyond the DeVitas' control such that they may seek an amendment of the Original Permit.

Having reached this conclusion, we may also answer Question 4(b) in the affirmative. In that Question, the DeVitas ask whether Lot 8 may be permitted despite its intrusion into a portion of an "accessory building envelope" shown on the 1995 Plat because this is not a change to a permit condition that was included to resolve an issue critical to the Original Permit. The parties

---

We cannot find any case law setting forth how foreseeability would factor into our analysis in this way. In Nehemiah II, the Supreme Court concluded that if a change was reasonably foreseeable at the time of the permit application, that may be grounds to deny an amendment application even when it is otherwise justifiable under Stowe Club Highlands. 168 Vt. at 294.

The foreseeability in this analysis is based on the change spurring the amendment application, not on the amendment application itself. Here, we have no evidence to show that the change in the State's wastewater regulations approximately 12 years after the Original Permit was foreseeable.

did not brief this specific issue extensively, however, the evidence presented aids us in ruling on the Question.

First, this Court has concluded that the amendment of a previously issued municipal subdivision approval is not specifically governed by Act 250 Rule 34(E). See In re Hawkins Bay Lane Minor Subdivision, No. 91-7-17 Vtec, slip op. at 7 (Vt. Super Ct. Envtl. Div. Aug. 7, 2018) (Durkin, J.). The determination of whether a proposed amendment seeks to alter a condition that was included to resolve an issue critical to the issuance of the permit is relevant in the Act 250 context, but not in the municipal context. See Act 250 Rules, Rule 34(E). As such, our analysis is limited to whether Lot 8 may be permitted despite its encroachment into a portion of the "accessory building envelope" included in the Original Permit.

As discussed above, the DeVitas are entitled to seek an amendment of the Original Permit due to the change in State wastewater regulations. At the time of the 1995 Plat, development of the north side of Fieldstone Drive was limited, in part, due to the wastewater regulations in effect at the time. See Original Permit p. 2—4. This resulted in the condition that "[a]ccessory farm buildings only shall be constructed in the building envelope on the north side of [Fieldstone Drive] of Lot 5." Id. at 5.

When determining the merits of an amendment application "[t]he central question . . . is not whether to give effect to the original permit conditions, but under what circumstances those permit conditions may be modified." Stowe Club Highlands, 166 Vt. at 37. As the accessory structure condition was implemented in part due to the wastewater regulations then in effect, and for the reasons discussed above in our general Hildebrand analysis, we conclude that this is precisely the type of circumstance in which the "accessory building envelope" condition may be modified to accommodate the present proposal. Therefore, we conclude that the condition does not invalidate Lot 8 as proposed.

II. **Whether Lots 7 and 8 comply with the "no build zone" demarcated on the Original Permit**

In the Original Permit, a "no build zone" was marked on the final plat. It contains 26.67 acres of open space. At issue in this matter is whether Lot 7 and 8's rear setbacks are inconsistent with the "no build zone."

The DeVitas assert that Lot 7 and Lot 8's encroachment on the "no build zone" is limited to the rear setbacks of those Lots only. Because no building is allowed in the rear setbacks, they assert that both of the Lots comply with the "no build zone." The Town disagrees. It asserts that the placement of a lot line, even if it does not include a building envelope, is an impermissible encroachment on the "no build zone" because the "open space" will no longer be open.

As noted above, it is the function of a subdivision permit "to approve plats of land" and, for this reason, "recorded plats necessarily become permit conditions." Stowe Club Highlands, 164 Vt. at 276. The failure to appeal a permit condition binds successors in interest. See 24 V.S.A. § 4472(d); Hildebrand, 2007 VT 5, ¶ 11. It is uncontested that the "no build zone" is a permit condition that the DeVitas must comply with. Instead, the scope of the "no build zone" is at issue in this appeal.

Subdivision permit conditions "must be specific enough to provide a landowner with notice that his or her property rights are fettered" to be enforceable. In re Willowell Found. Conditional Use Certificate of Occupancy, 2016 VT 12, ¶¶ 15, 18, 201 Vt. 242 (quoting In re Kostenblatt, 161 Vt. 292, 298 (1994)); see also In re Farrell & Desautels, Inc., 135 Vt. 614, 616—17 (1978) ("Conditions imposed by a zoning board must be expressed with sufficient clarity to give notice of the limitations on the use of the land."). As such, "we will not recognize implied permit conditions as subdivision permits." Stowe Club Highlands, 164 Vt. at 276.

Here we have a clear permit condition creating the "no build zone" and marking its area on the 1995 Plat. On the recorded plat, the area is marked as "no build zone portion of Lot 5 with restricted land use." No other guidance is provided regarding the scope of this condition as it relates to development.

The Bylaw defines "building" as "a structure that is permanently tied to the ground by footings or a foundation and that has a roof." Bylaw § 46.3.19. Buildings and development are confined to the "building envelope" with limited exceptions that are irrelevant to our present analysis. Bylaw § 46.3.21.

Considering these factors, we conclude that the "no build zone" restricts structures and development on that portion of the subdivision. We must now determine whether the encroachment of a building setback is a violation of this permit condition.

The term "building setback" is well understood.  See <u>In re Hinesburg Hannaford Act 250 Permit</u>, 2017 VT 106, ¶ 21, 206 Vt. 118 (citing *Setback*, Black's Law Dictionary (10th ed. 2014)).  A setback is "[t]he minimum amount of space required between a lot line and a building line . . . setbacks are designed . . . to keep buildings from being erected too close to the property lines." *Setback*, Black's Law Dictionary.  As such, no buildings or structures are permitted in the setback.

Therefore, this intrusion is theoretical rather than actual.  The land cannot be built upon and therefore no building will occur in the "no build zone."  As such, open space will remain open.  We therefore conclude that this intrusion is not a violation of the Original Permit and may be permitted as proposed.

### III.  Whether the Bylaws' open space requirement applies to the whole subdivision or just the present proposal

The parties have spent considerable time, both at trial and in their post-trial briefs, on the issue of whether Bylaw § 31.7.1 requires that 75% of the entire subdivision or just 75% of Lot 5 must be devoted to open space.

Having reviewed the DeVitas' Statement of Questions, we are unsure of where this issue is directly raised.  However, while our review is limited to issues raised in the Statement of Questions, our review will include an analysis and determination of those matters intrinsic to the legal issues raised in the Statement of Questions.  <u>In re LaBerge NOV</u>, 2016 VT 99, ¶ 15, 203 Vt. 98 (citing <u>In re Jolley Assocs.</u>, 2006 VT 132, ¶ 9, 181 Vt. 190); see also <u>In re Atwood Planned Unit Dev.</u>, 2017 VT 16, ¶ 17, 2014 Vt. 301.  The parties appear to agree that this issue is at least intrinsic to the Statement of Questions and therefore we address it here.

The DeVitas assert that the only parcel being subdivided by their application is Lot 5, therefore, Lot 5 is the only lot which must comply with the open space requirement.  Alternatively, the Town asserts that the requirement applies to the entirety of the subdivision.

We begin by noting that, to the extent the Town argues that the 75% open space requirement is a condition of the Original Permit, we conclude that assertion is unsupported.  We can find no condition in the Original Permit or the 1995 Plat which officially designates Lot 5 as open space, common land, or subjects the overall subdivision to a specific percentage or acreage of such land.  While the "no build zone" designates open space in the 1995 Plat, it does not serve as a formal condition requiring that a set amount of land be set aside outside of its parameters.

There is therefore no notice regarding this alleged restriction on Lot 5. This is precisely the kind of implied permit condition that we will not recognize. See Stowe Club Highlands, 164 Vt. at 276. This result is bolstered by the fact that the Planning Commission did impose a clearly demarcated "no build zone" which does not include the land the DeVitas presently seek to subdivide. Having reached that conclusion, we turn to the scope of the applicability of the Bylaw open space requirement.

When a land permit decision has become final, a party cannot collaterally attack that final decision in a later proceeding. Levy v. Town of St. Albans Zoning Bd. of Adjustment, 152 Vt. 139, 141 (1989); see also 24 V.S.A. § 4472(d) (barring collateral attacks on final permit decisions). The Vermont Supreme Court has applied the principles of finality in instances where an applicant seeks to alter specific aspects of a previously permitted project without altering the project as a whole. See In re Champlain Parkway Wetland Conditional Use Determination, 2018 VT 123; see also In re Unified Buddhist Church, Inc., 2006 VT 50, 180 Vt. 515; In re Taft Corners Assocs., Inc., 160 Vt 583 (1993).

In Champlain Parkway, the Supreme Court concluded that, based on the principles of finality, the Agency of Natural Resources' decision to extend an expiration date on a permit approving a construction project did not implicate other permit conditions in a way that opened those conditions up to collateral attacked. 2018 VT 123, ¶¶1, 29—31. The Supreme Court then affirmed this Court's decision to dismiss a number of appellant's Questions because they were outside the limited scope of the Agency's determination. Id., ¶ 32.

Here, the Original Permit is final and binding as it was not appealed. 24 V.S.A. § 4472(d). Therefore, aspects of that decision unaffected by the Devitas' present application cannot be collaterally attacked. The DeVitas' application seeks amendments relating to Lot 5 only. Their application does not seek to amend any other aspect of the Original Permit. Based on the principles of finality and the scope of the proposed amendment, we conclude that the DeVitas must comply with the Bylaw open space requirement with respect to Lot 5 alone.[3] It appears uncontested that their proposal does satisfy this requirement.

---

[3] We note that, while the DRB's decision below is not binding on the Court in its de novo review, the DRB did appear to reach the same conclusion on this issue. See 2017 Discretionary Permit Denial, p. 9.

We note that, separate and apart from the principles of finality which lead us to this conclusion, the proposition offered by the Town is untenable. If the Court were to adopt its position and apply the open space requirement to the entirety of the subdivision, the DeVitas could not develop Lot 5 in any meaningful way to respond to a change in wastewater regulations which had previously limited their ability to develop the Lot. This result appears overly harsh in light of the facts presented to us.

Therefore, the Bylaw open space requirement set forth in § 31.7.1 is applicable to the application only with respect to Lot 5 and the uncontested facts show that the application complies with this requirement.

## IV.     Whether the Town may condition the hammerhead street in this application

The DeVitas assert that the Town may not condition the present application on the change of the existing hammerhead style street end, which was lawfully constructed pursuant to the Original Permit, to a cul-de-sac style. The Town asserts that this condition is well within its authority.

As discussed above, a permit becomes final and binding when unappealed. 24 V.S.A. § 4472(d). The Original Permit authorized the hammerhead street design pursuant to the Bylaw then in effect. The Devitas then constructed Fieldstone Drive pursuant to the Original Permit. In 2010, the Town adopted new regulations requiring cul-de-sacs rather than hammerhead road designs. In 2015, the Town took ownership and control over Fieldstone Drive.

The present application does not propose any changes to the hammerhead other than providing two driveways with access to the hammerhead. We find no justification in this present appeal to collaterally attack the Original Permit's approval of the hammerhead design and the Town has cited to no authority under which they may require such a retrofit on an existing permitted hammerhead design not owned by the applicant in this appeal.

For these reasons, we conclude that the present application cannot be conditioned to require a change from the hammerhead street design to a cul-de-sac.

### Conclusion

For the foregoing reasons, we conclude that the present application is one for a permit amendment, not for an original subdivision. We also conclude that the DeVitas are entitled to

13

amend their previous permit due to changes in the State wastewater regulations that resulted in more buildable area in the subdivision. We additionally conclude that Lot 7 and Lot 8's encroachment on the "no build zone," as set out in the 1995 Plat, is permissible as the encroachment does not permit any building. Further, Lot 8's incursion is permissible despite the "accessory building envelope" as set out in the 1995 Plat. Finally, we conclude that the Town may not condition the present amendment application on the conversion of the previously approved hammerhead street design into a cul-de-sac. For these reasons, we **REVERSE** the DRB's decision to deny the DeVitas' present application.

We **REMAND** this matter back to the Town for the sole purpose of issuing necessary approvals consistent with this decision.

This concludes the matter before the Court. A Judgment Order accompanies this Decision.

Electronically signed on April 23, 2019 at 08:40 AM pursuant to V.R.E.F. 7(d).

_____

Thomas G. Walsh, Judge
Superior Court, Environmental Division